UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CORY CORDELL SMITH,

    Plaintiff,

    v.

INFLECTION RISK SOLUTIONS, LLC,

    Defendant.

Case No. 25-cv-07620-TSH

**ORDER RE: MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

Re: Dkt. Nos. 20, 20-1

## I.    INTRODUCTION

Plaintiff Cory Cordell Smith brings this action against Defendant Inflection Risk Solutions, LLC ("Inflection"), alleging violations of the Fair Credit Reporting Act (FCRA) and California's Consumer Credit Reporting Agencies Act (CCRAA). ECF No. 1. Pending before the Court is Inflection's Motion to Compel Arbitration. ECF Nos. 20 (Notice), 20-1 ("Mot."). For the reasons stated below, the Court **GRANTS** the motion and **STAYS** the proceedings in this Court pending resolution of the arbitration.[1]

## II.    BACKGROUND

### A.    Factual Background

Smith, a resident of New York City, is a consumer who used Airbnb to book housing and lodging. Compl. ¶¶ 4–5, 21–22 (ECF No. 1). Inflection is a Consumer Reporting Agency that prepares and sells consumer background checks, including to Airbnb. *Id.* ¶¶ 6, 8, 21.

Overall, Smith alleges that Inflection provided an inaccurate background check report to Airbnb that "improperly attributed criminal records" from another individual to Smith; in doing

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 13, 34.

so, Inflection "failed to follow reasonable procedures to ensure the accuracy of the information contained in [Smith's] consumer report." *Id.* ¶¶ 18–21.

### 1. Inflection's Services

Inflection "sells consumer background checks to property managers of dwellings and apartments for the use of deciding whether to offer tenancy to prospective tenants or to take adverse action such as rejection of consumer applications for housing." *Id.* ¶ 8. Airbnb is one company that uses Inflection's background check services. Mot. at 6:17–26 (citing Declaration of Christina Taylor ("Taylor Decl.") ¶ 3 (ECF No. 20-3)).

"In connection with these services, Inflection hosts a website where consumers can, among other things, view background reports that have been provided by Inflection to the end users for their own convenience." *Id.* (citing Taylor Decl. ¶ 3). When a consumer accesses Inflection's website to view a background report,

> a consumer must enter certain information to verify his or her identity, including a first name, middle name, last name, email address, and date of birth. Consumers are also presented with a check box, where they can indicate that they agree to Inflection's Terms of Use and Privacy Policy. The words 'Terms of Use' and 'Privacy Policy' are set off prominently in distinctive blue font indicating that they are clickable hyperlinks. A consumer can click on the words 'Terms of Use' and 'Privacy Policy' to navigate to each policy. The Terms of Use and Privacy Policy are also available on Inflection's website. The Terms of Use are available at https://www.inflection.com/terms-of-use.

*Id.* at 7:2–13 (citing Taylor Decl. ¶¶ 4, 6–7, Ex. 1). "A consumer must check the box that says, 'Yes, I agree to Inflection's Terms of Use and Privacy Policy' before continuing to access services through the Inflection website." *Id.* at 7:14–15 (citing Taylor Decl. ¶ 5).

Inflection's Terms of Use govern all of Inflection's services, including "all websites, mobile applications, information and screening services, and APIs." *Id.* at 8:1–7 (citing Taylor Decl., Ex. 3 ("Terms of Use") (ECF No. 20-3 at 10)). The first paragraph of the Terms of Use states:

> IF YOU LIVE IN, OR YOUR PRINCIPAL PLACE OF BUSINESS IS IN THE UNITED STATES, PLEASE NOTE THE BINDING CLASS ACTION WAIVER IN SECTION 6.12 AND ARBITRATION AGREEMENT IN SECTION 6.13, WHICH AFFECTS YOUR DISPUTE RESOLUTION RIGHTS WITH US.

United States District Court
Northern District of California

*Id.* at 8:8–13 (citing Terms of Use at 1) (emphasis in bold omitted). In the Terms of Use, a section titled, "AGREEMENT TO RESOLVE DISPUTES BY BINDING INDIVIDUAL ARBITRATION," states:

> PLEASE READ THIS SECTION CAREFULLY. IT IS AN AGREEMENT TO ARBITRATE ANY AND ALL DISPUTES ('ARBITRATION AGREEMENT') BETWEEN YOU AND INFLECTION (COLLECTIVELY, 'THE PARTIES'), AND LIMITS THE MANNER IN WHICH THE PARTIES CAN SEEK RELIEF. BY ENTERING INTO THIS AGREEMENT, BOTH PARTIES CHOOSE TO HAVE ALL DISPUTES BETWEEN THEM RESOLVED THROUGH FINAL AND BINDING INDIVIDUAL ARBITRATION INSTEAD OF THROUGH ANY FORM OF LITIGATION IN ANY COURT OF LAW. THIS MEANS THAT RIGHTS A PARTY WOULD OTHERWISE HAVE IN LITIGATION MAY NOT BE AVAILABLE OR MAY BE MORE LIMITED, INCLUDING THE RIGHT TO APPEAL.

*Id.* at 8:15–23 (citing Terms of Use at Section 6.13) (emphasis in bold omitted). The Terms of Use further contain a provision, titled "Arbitration Agreement," that states, in relevant part:

> You agree that any dispute, claim, or controversy ('Claim') between you and Inflection . . . arising out of or relating to the Terms, your electronic access to, purchase of, and/or use of any Inflection product or service, including, without limitation, tort and contract claims, claims based on any federal, state, or local statute, law, or regulation, must be resolved exclusively by final and binding arbitration, rather than in court, with the exception of claims related to validity, scope, or enforceability of this Arbitration Agreement.

*Id.* at 9:5–10 (citing Terms of Use at 19).

"If consumers do not want to view the background reports on the website, they can write or call Inflection." Taylor Decl. ¶ 3. Similarly, consumers may dispute any information in their background report "directly through the website for their own convenience," or by writing or calling Inflection. Mot. at 6:17–26 (citing Taylor Decl. ¶ 3).

### 2.    Inflection's Actions

Smith alleges the following in the Complaint. On August 23, 2025, Inflection "prepared a consumer background check report on [Smith], which included criminal records that did not belong to [Smith]." Compl. ¶ 11. The report incorrectly identified Smith as "'Cory James Smith' with the same date of birth as [Smith]," but falsely attributed criminal records to Smith that belonged to "a career criminal residing in North Canton, Ohio." *Id.* ¶ 12. A "Checkr report dated

3

August 6, 2025, confirmed [Smith's] true background as clear, with no criminal history, and no connection to the criminal records associated with the individual in Ohio." *Id.* ¶ 17.

Inflection had previously provided this inaccurate background report on Smith to Airbnb. *Id.* ¶ 21. Based on the report, "Airbnb took adverse action against [Smith] by locking him out of his account." *Id.* Between 2021–2025, Smith "was unable to access his Airbnb account and was therefore denied housing and lodging on the platform[.]" *Id.* ¶ 22. As a result, Smith experienced "economic loss and inconvenience," and suffered emotional distress and harm to his reputation. *Id.* ¶¶ 25–28.

### 3.    The Parties' Relationship

The parties dispute whether they entered into a contract with one another. Inflection asserts that Smith used its website to access his background report and agreed to Inflection's Terms of Use, including the Arbitration Agreement. Mot. at 6:1–8. Christina Taylor, who managed Inflection's operations in the past and continues to work with operations, attests that "Inflection maintains records in the regular course of business regarding all reports and actions taken by consumers, including any consumer's acceptance of Inflection's Terms of Use." Taylor Decl. ¶¶ 1, 9. Through Taylor, Inflection proffers evidence of a "true and correct copy of a screenshot showing the user interface . . . that [Smith] would have seen when he accessed his report via Inflection's website." *Id.* ¶ 4, Ex. 1. According to Inflection, its records, "which are created automatically in the course of business at the time of the event," show that Smith "signed in with his name, the email address ccsmith78@gmail.com, and his date of birth, and then clicked the 'yes' button to agree to Inflection's Terms of Use and Privacy Policy on August 23, 2025 at 6:27 p.m., and again on September 2, 2025 at 1:03 p.m." Mot. at 7:19–26 (citing Taylor Decl. ¶ 10). Inflection proffers a partially redacted "copy of the electronic record indicating that Smith agreed to the Terms of Use two times." Taylor Decl. ¶ 10, Ex. 2. Inflection avers that Smith filed a dispute on Inflection's website on August 23, 2025, that Inflection issued an updated report for Smith on September 2, 2025, and that "[a]fter he agreed to the Terms of Use and Privacy Policy, [Smith] was able to view a copy of the background reports pertaining to him that Inflection had provided to Airbnb, Inc." Mot. at 6:27–7:26 (citing Taylor Decl. ¶¶ 11, 13).

United States District Court
Northern District of California

Smith asserts that he "did not deal with Inflection during the pendency of his background check" but instead only dealt with Airbnb. Opp. at 3:24–4:11 (citing Declaration of Cory Cordell Smith ("Smith Decl.") (ECF No. 24-1)). Smith avers that he "interacted with Airbnb to secure housing over several years" and thought he was contracting with Airbnb. Smith Decl. ¶ 2. Smith "was not familiar with Inflection and had no direct contact with them." *Id.* He believed he "was interacting with Airbnb, not Inflection," and did not "intend to deal with Inflection." *Id.* ¶ 5. Smith does "not recall seeing any Terms of Use, arbitration clause, or any notice that viewing [his] background report required agreement to arbitration," nor did he "knowingly or voluntarily agree to arbitrate any dispute with Inflection." *Id.* ¶¶ 3–4.

**B.    Procedural Background**

On September 8, 2025, Smith filed this action against Inflection, alleging four causes of action: (1) Negligent Violation of the FCRA (15 U.S.C. § 1681e(b)); (2) Willful Violation of the FCRA; (3) Negligent Violation of the CCRAA (Cal. Civ. Code § 1785.14); and (4) Willful Violation of the CCRAA. Compl. ¶¶ 30–57 (ECF No. 1). Smith seeks, *inter alia*, statutory and punitive damages. *Id.* at 11.

On November 20, 2025, Inflection filed the instant Motion to Compel Arbitration. ECF Nos. 20 (Notice), 20-1 ("Mot."). On December 2, 2025, Smith filed an Opposition. ECF No. 24 ("Opp."). On December 9, 2025, Inflection filed a Reply. ECF No. 25 ("Reply").

## III.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") "governs the enforceability of arbitration agreements in contracts involving interstate commerce." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) (citing 9 U.S.C. § 1 *et seq.*). The FAA "makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract.'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 649–50 (2022) (quoting 9 U.S.C. § 2). The purpose of the FAA is to "rigorously enforce" private arbitration agreements according to their terms. *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). The FAA "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S.

213, 218 (1985) (citing 9 U.S.C. §§ 3, 4) (emphasis in original).  The Court's role is to decide: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  "However, these gateway issues can be expressly delegated to the arbitrator where the parties *clearly and unmistakably* provide otherwise." *Brennan*, 796 F.3d at 1130 (emphasis in original) (cleaned up).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Chiron*, 207 F.3d at 1131 (cleaned up).

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *accord Pinnacle Museum Tower Ass'n  v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012).  "California law, like federal law, reflects a strong policy favoring arbitration agreements." *Wagner Constr. Co. v. Pac. Mech. Corp.*, 41 Cal. 4th 19, 31 (2007) (cleaned up).  "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." Cal. Civ. Proc. Code § 1281.  "The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." *Pinnacle*, 55 Cal. 4th at 236.

In deciding a motion to compel arbitration, courts must "treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Shepardson v. Adecco USA, Inc.*, No. 15-cv-05102-EMC, 2016 WL 1322994, at *2 (N.D. Cal. Apr. 5, 2016) (quoting *Chavez v. Bank of Am.*, No. C10-653-JCS, 2011 WL 4712204, at *3 (N.D. Cal. Oct. 7, 2011)).  A court may consider evidence outside the pleadings when ruling on a motion to compel arbitration. *Thompson v. Isagenix Int'l LLC*, 849 F. App'x 712, 712 (9th Cir. 2021).

United States District Court
Northern District of California

### IV.   DISCUSSION

Inflection requests the Court compel all Smith's claims to arbitration and stay the case pending arbitration. Mot. at 15. Smith requests the Court deny Inflection's Motion because (1) Inflection fails "to establish the formation of a binding contract"; (2) Inflection's "Terms of Use were not 'reasonably conspicuous'"; (3) even if Smith entered a contract with Inflection, "the arbitration clause is unenforceable due to both procedural and substantive unconscionability"; and (4) the "FCRA and CCRAA claims fall outside the scope of the arbitration agreement." Opp. at 3:2–8:2. Alternatively, Smith requests the Court resolve factual disputes regarding contract formation before ruling on Inflection's Motion. *Id.* at 8.

In sum, the Court concludes that because Inflection establishes the existence of a valid contract and arbitration agreement between the parties, and that the arbitration agreement covers Smith's claims, the Court must grant Inflection's Motion to Compel Arbitration and stay the proceedings.

### A.   Contract Formation

As a threshold matter, the parties vigorously dispute whether they have a contractual relationship at all. Because Inflection's argument that Smith "entered into a valid and binding Arbitration Agreement" rises and falls with its assertion that Smith contracted with Inflection, the Court first addresses the issue of contract formation. Mot. at 11:1–8. Inflection argues that "[w]hen [Smith] used Inflection's online platform to access his background report, [Smith] unequivocally consented to Inflection's Terms of Use[.]" *Id.* at 6:1–8. Smith contends that he "did not deal with Inflection during the pendency of his background check" but instead only dealt with Airbnb. Opp. at 3:24–4:11.

"Arbitration under the [FAA] is a matter of consent, not coercion[.]" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). As such, to hold a party to an arbitration clause, a court must discern whether that party entered into a contract in the first place. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1153–54 (9th Cir. 2025). Indeed, "challenges to the very existence of the contract are, in general, properly directed to the court[.]" *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017).

The parties agree that California law applies to the question of contract formation in this case. Mot. at 11:3–8; Opp. at 5:20–21; *see Beltran v. PeopleReady, Inc.*, No. 3:23-cv-00179-WHO, 2023 WL 3092973, at \*7 (N.D. Cal. Apr. 25, 2023) (applying state law to issue of contract formation). Under California law, a contract requires (1) parties capable of contracting; (2) consent; (3) a lawful object; and (4) consideration. Cal. Civ. Code § 1550. An essential element of any contract is mutual consent. *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." *Id.* (cleaned up). "Online contracts are subject to the same elemental principles of contract formation as paper contracts." *Chabolla*, 129 F.4th at 1154. On the Internet, a party may manifest assent through conduct. *See Weeks v. Interactive Life Forms, LLC*, 100 Cal. App. 5th 1077, 1084 (2024) ("On the internet, a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons.") (cleaned up).

The party moving to compel arbitration bears "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) (cleaned up). "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (cleaned up).

Here, under the applicable summary judgment standard, the Court finds that Inflection demonstrates that no genuine dispute of fact exists concerning Smith's agreement to Inflection's Terms of Use. *See Beltran*, 2023 WL 3092973, at \*6 (applying summary judgment standard to issue of contract formation on motion to compel arbitration). Smith argues that there is no binding contract between the parties because he did not manifest consent to Inflection's Terms of Use. Opp. at 3:19–22. Overall, the Court agrees with Inflection that because it provides sufficient proof of Smith's assent to its Terms of Use, and Smith's Declaration fails to create a genuine factual dispute, the Court is not barred from granting Inflection's Motion. *See* Reply at 1:7–4:12; *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 831 (9th Cir. 2022) ("At summary judgment, if a court concludes that there are genuine disputes of material fact as to whether the parties formed an

8

arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved.") (cleaned up).

First, Inflection must provide adequate evidence demonstrating Smith's assent to its Terms of Use. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining party moving for summary judgment bears the initial burden of identifying those portions of the evidence that demonstrate the absence of a genuine issue of material fact). Smith argues unpersuasively that Inflection has not produced any competent evidence showing that Smith "accessed a background report through an online portal" and "checked a box indicating assent to Terms of Use." Opp. at 2:18–3:5; *see also id.* at 3:23–4:22 ("Inflection presents no evidence tying [Smith] to the alleged 'Yes' checkbox."). Christina Taylor attests that she works with Inflection's operations, that she has personal knowledge of the matters set forth in her declaration, and that the relevant documents are maintained in the regular course of Inflection's business. Taylor Decl. ¶¶ 1, 9. Taylor attests that consumers who use Inflection's website must enter certain information to verify their identity, including a first name, middle name, last name, email address, and date of birth. *Id.* ¶ 4. She attests that users must also check a box agreeing to Inflection's Terms of Use before continuing to access services through Inflection's website. *Id.* ¶ 5, Ex. 1. And she attests that Smith used Inflection's website to access his background report on two separate occasions where he clicked the 'yes' button to agree to Inflection's Terms of Use. *Id.* ¶¶ 10–11, 13, Ex. 2. Notably, accessing Smith's background reports requires personal information, such as Smith's full name, email address, and date of birth. *Id.* ¶ 10; *see Gonzalez v. Ceva Logistics U.S., Inc.*, No. 16-cv-04282-WHO, 2016 WL 6427866, at *3–4 (N.D. Cal. Oct. 31, 2016) (finding the fact that the application process "required applicants to fill out detailed personal information that only the applicant would know" was sufficient to show that no one else could have completed the agreement). Taylor further attests that Smith filed a dispute on Inflection's website on the same day that his background report was accessed on the website. Taylor Decl. ¶¶ 11, 13. This bolsters Inflection's assertion that Smith entered a contract with Inflection by using Inflection's website to obtain his report. *See* Reply at 3:11–16.

To be sure, Inflection's Motion is devoid of evidence showing actual screenshots of Smith's interactions with Inflection, IP logs, or confirmation emails. Opp. at 2:19–26, 4:4–11. Yet Smith points to no authority requiring Inflection to produce these items. In fact, courts in this district have held that evidence similar to that proffered by Inflection here is sufficient to establish contract formation. Inflection cites *Taylor v. Inflection Risk Sols., LLC*, where a court in this district "reviewed the very same arbitration agreement at issue in this case, rejected similar arguments by the consumer, and enforced Inflection's arbitration agreement." Reply at 1:2–7, 4:19–24, 9:5–9 (citing – F. Supp. 3d –, No. 25-cv-03491-CRB, 2025 WL 3493898 (N.D. Cal. Oct. 17, 2025)). *Taylor* is indeed on point. In *Taylor*, the court analyzed whether a consumer assented to Inflection's Terms of Use when the consumer accessed his background report through Inflection's website. *Taylor*, 2025 WL 3493898, at *1–2. The *Taylor* court found that the plaintiff indicated his assent to Inflection's Terms by checking a box on Inflection's website, acknowledging he agreed to Inflection's hyperlinked Terms, prior to accessing his background report on the website. *Id.* at *2. As in *Taylor*, Inflection proffers evidence that it presented Smith with its Terms via a "Terms of Use" hyperlink on its website and made it clear that Smith had to agree to these Terms by checking the box before accessing his background report. *See* Reply at 2:18–23 (citing Taylor Decl. ¶ 4, Ex. 1); *cf. Taylor*, 2025 WL 3493898, at *2. And like *Taylor*, Inflection proffers business records showing that Smith assented to Inflection's Terms by checking the box. *See* Reply at 2:24–3:3 (citing Taylor Decl. ¶¶ 9–10, Ex. 2); *cf. Taylor*, 2025 WL 3493898, at *2. Therefore, Inflection has met its initial burden of proof by providing adequate evidence to support Smith's assent to its Terms of Use.

Second, because Inflection meets its initial burden, Smith must proffer evidence that could permit a factfinder to conclude that Smith did not assent to Inflection's Terms of Use. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (explaining if the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue for trial). To that end, Smith's assertion that "the Court should deny the motion or hold a hearing" because "factual questions exist as to contract formation" is unavailing. Opp. at 8:3–17. At the outset, Smith employs the wrong standard—the question is not whether Smith

United States District Court
Northern District of California

creates a factual dispute regarding contract formation but rather whether Smith creates a *genuine* dispute of fact. *See Beltran*, 2023 WL 3092973, at *8 (explaining that presence of "a *genuine* dispute" as to whether the plaintiff "consented to the agreement" would prevent the court from ruling on defendant's motion to compel arbitration) (emphasis in original). This Smith has failed to do.

The Court agrees with Inflection that Smith's Declaration "fails to create any dispute sufficient to warrant any evidentiary hearing." Reply at 4:7–12. True, Smith's Declaration is admissible evidence of what he experienced because it is based on his personal knowledge and reflects testimony that he would provide at trial. *See* Smith Decl. ¶ 1; Fed. R. Civ. P. 56(c) (allowing the use of declarations in a summary judgment motion that are based on personal knowledge of a competent declarant and set out facts that would be admissible in evidence). However, as Inflection points out, Smith "does not *actually* dispute that he viewed his report online, which would have required his agreement to the Terms of Use." Reply at 4:2–6 (emphasis in original). Smith attests that he "thought [he] was contracting with [Airbnb]," he does "not recall" seeing Inflection's Terms of Use, he "believed" he was interacting with Airbnb and not Inflection, he did not "intend to deal with Inflection," and he "did not knowingly or voluntarily agree to arbitrate any dispute with Inflection." Smith Decl. ¶¶ 2–5. In short, Smith equivocates. To be sure, it is Inflection's burden to prove the existence of an agreement between the parties. *Norcia*, 845 F.3d at 1283; *see* Opp. at 3:19–22. But Smith's averments do not create a genuine dispute regarding whether he contracted with Inflection. *See Fed. Election Comm'n. v. Toledano*, 317 F.3d 939, 949–50 (9th Cir. 2002) (explaining testimony "such as 'I don't recall,' 'I forgot,' 'I'm not entirely sure,' and 'I have no independent recollection'" fails to create a genuine issue of fact). Therefore, "[i]n light of the detailed evidence showing that [Smith] did in fact visit the website and enter his personal information, no reasonable fact finder could find for [Smith] based only on his representation that he does not recall doing so." *Magee v. WD Servs., LLC*, No. 2:16-cv-02132-JAD-VCF, 2017 WL 424857, at *2 (D. Nev. Jan. 30, 2017); *see also Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 942 (N.D. Cal. 2023) ("Google has offered evidence that Plaintiffs checked a box agreeing to Fitbit's Terms of Service when they created their Fitbit

United States District Court
Northern District of California

accounts. Plaintiffs' bare assertion that they do not recall this process does not overcome overcome [*sic*] Google's evidence.") (internal citation omitted).

Accordingly, Inflection has met its burden in showing that a contract exists between Smith and Inflection.

**B.      Arbitration Agreement**

Smith does not dispute that Inflection's Terms of Use contain an Arbitration Agreement. Instead, Smith argues that the Arbitration Agreement does not apply here because (1) he did not have notice of the Arbitration Agreement; (2) the Arbitration Agreement is unenforceable because it is unconscionable; and (3) even if the Arbitration Agreement is valid, it does not cover his claims. Opp. at 4:23–8:2. The Court addresses each of these arguments in turn.

**1.      Notice**

Smith argues that he did not have notice of the Arbitration Agreement because (1) Inflection's Terms of Use were not "reasonably conspicuous"; and (2) there is no evidence that he would understand that "clicking to view a background report, after [Inflection] had already sent that report to Airbnb, would bind him to an arbitration clause hidden in a separate website's boilerplate terms." Opp. at 4:23–5:16. Inflection responds that (1) Smith had adequate inquiry notice of the Arbitration Agreement; and (2) Inflection highlighted the Arbitration Agreement's "existence multiple times, including in full capital letters at the very beginning of the Terms of Use[.]" Reply at 4:13–6:21.

The party moving to compel arbitration bears the burden of proving that the party resisting arbitration had notice of the agreement to arbitrate. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Under California law, "notice—actual, inquiry, or constructive— is the touchstone for assent to a contract." *Cruz v. Tapestry, Inc.*, 113 Cal. App. 5th 943, 951 (2025) (cleaned up). Constructive notice is "such notice as is implied by law." *Curtis v. United Transfer Co.*, 167 Cal. 112, 114 (1914); *see also Alfaro v. Cmty. Hous. Improvement Sys. & Plan. Assn., Inc.*, 171 Cal. App. 4th 1356, 1385 (2009) ("Constructive notice is the equivalent of *actual knowledge;* i.e., knowledge of its contents is conclusively presumed.") (emphasis in original) (cleaned up). Inquiry notice is a specific type of constructive notice where a party is charged with

notice of a fact because the party "has knowledge of circumstances which, upon reasonable inquiry, would lead to that particular fact." *Vasquez v. LBS Fin. Credit Union*, 52 Cal. App. 5th 97, 108 (2020) (citation omitted).

Internet contracts may take several forms. *See Chabolla*, 129 F.4th at 1154 ("In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different 'assent' mechanisms."). "A '*clickwrap*' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021) (citation omitted) (emphasis in original). In most instances, the contractual terms are not actually displayed on the same screen as the "I accept" button, but are instead provided via a hyperlink that, when clicked, take the user to a separate page displaying the full set of terms. *Id.* Courts generally find clickwrap agreements to be enforceable. *Id.* at 466; *accord Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024); *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) ("To ensure that an online agreement passes muster, clickwrap is the safest choice."). "Clickwrap agreements have been held to manifest assent, even on consumers who did not read them, because the website has put the consumer on constructive notice of the contractual terms." *Weeks*, 100 Cal. App. 5th at 1085 (cleaned up).

In the absence of actual notice, a website provider may establish constructive notice by showing that "the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." *Sellers*, 73 Cal. App. 5th at 461. "Where the authenticity of screenshots is not subject to factual dispute, courts may decide the issue of constructive notice as a pure question of law." *Keebaugh*, 100 F.4th at 1015 (cleaned up).

Here, the Court finds that Inflection demonstrates that Smith had constructive notice of the Arbitration Agreement. Smith does not dispute that Inflection's proffered screenshot—showing that a consumer is required to check a box agreeing to Inflection's Terms of Use to access their background report—is authentic. Reply at 2:18–23, 5:4–13; *see* Taylor Decl. ¶ 4, Ex. 1

13

(Screenshot). Instead, Smith contends that Inflection's Terms of Use were not "reasonably conspicuous." Opp. at 4:23–5:1. But this is the wrong test—conspicuous notice is only necessary to establish inquiry notice for a browsewrap[2] or sign-in wrap[3] agreement. *See Long*, 245 Cal. App. 4th at 863, 866 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)) (holding that website's design and "conspicuousness of the hyperlinks to the Terms of Use" were not sufficient "to put a reasonably prudent Internet consumer on inquiry notice of the browsewrap agreement's existence and contents"); *Sellers*, 73 Cal. App. 5th at 465–66, 480 (holding notices were not "sufficiently conspicuous" to provide inquiry notice to users for sign-in wrap agreement); *Keebaugh*, 100 F.4th at 1014 (discussing enforceability of sign-in wrap agreement under California law based on inquiry notice); *Kroskey v. Elevate Labs, LLC*, No. 5:24-cv-08113-EJD, 2025 WL 1507091, at *3 (N.D. Cal. May 27, 2025) (same). In contrast, Inflection's Terms of Use constitute a clickwrap agreement because the user accepts the Terms "by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." *Sellers*, 73 Cal. App. 5th at 463; *see* Taylor Decl. ¶ 5. Thus, the question is whether Inflection provides constructive notice of its Terms. *Weeks*, 100 Cal. App. 5th at 1085. Inflection's evidence shows that (1) prior to accessing his report on Inflection's website, Smith was required to check a box next to the following statement: "Yes, I agree to Inflection's Terms of Use and Privacy Policy"; (2) the words "Terms of Use" were a hyperlink to Inflection's Terms; and (3) Smith affirmatively checked the box next

[2] "A '*browsewrap*' agreement is one in which an internet user accepts a website's terms of use merely by browsing the site." *Sellers*, 73 Cal. App. 5th at 463 (cleaned up) (emphasis in original). "Unlike the other common form of Internet contract—known as 'clickwrap' agreements— browsewrap agreements do not require users to affirmatively click a button to confirm their assent to the agreement's terms; instead, a user's assent is inferred from his or her use of the Web site." *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 858 (2016).

[3] "'*Sign-in-wrap*' agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service." *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 945 (2022) (citation omitted) (emphasis in original). "Sign-in wrap agreements do include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button. Instead, the consumer is purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in' or 'sign up' for an account." *Id.* at 946 (citation omitted) (emphasis in original).

to the Terms of Use hyperlink. Reply at 5:4–13; *see* Taylor Decl. ¶¶ 4–7, 10, Exs. 1–2. This sufficiently establishes constructive notice of Inflection's Terms because the Terms were presented to Smith in a manner that made clear he was assenting to the Terms by checking the box next to the terms. *Sellers*, 73 Cal. App. 5th at 461. Therefore, Smith's act of affirmative assent (checking the box) is sufficient to impute knowledge of Inflection's Terms. *Cf. Taylor*, 2025 WL 3493898, at *2 (finding plaintiff had notice of Inflection's terms when he checked the box indicating his assent to the terms).

Smith next contends that even if he was on notice of Inflection's Terms, he did not have notice of the Arbitration Agreement. Opp. at 5:1–16. This argument likewise fails. First, it is immaterial that Smith did not have actual notice of the Arbitration Agreement. *See* Smith Decl. ¶ 4 ("I do not recall seeing . . . any arbitration clause"); *Pinnacle*, 55 Cal. 4th at 236 ("An arbitration clause within a contract may be binding on a party even if the party never actually read the clause."). As discussed above, Smith had constructive notice of Inflection's Terms—this notice encompasses *all* of Inflection's Terms. *See Randas v. YMCA of Metro. Los Angeles*, 17 Cal. App. 4th 158, 163 (1993) ("Ordinarily, one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it.") (citation omitted); *cf. Rose v. Int'l Bus. Machs. Corp.*, No. 2:23-cv-09123-MCS-SSC, 2024 WL 3914471, at *2 (C.D. Cal. June 25, 2024) ("By accepting the terms of the clickwrap agreement, Plaintiff accepted the forum selection clause compelling disputes between Janssen and Plaintiff arising from the agreement to be litigated in New York."). Second, the Arbitration Agreement is displayed within Inflection's Terms in a way that provides notice of this clause. To be sure, "[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Cruz*, 113 Cal. App. 5th at 952 (citation omitted). But Inflection meets this standard—it proffers evidence that the Arbitration Agreement is mentioned at the beginning of Inflection's Terms in all capital letters, and it is contained in its own specific numbered section within the Terms, with its own capitalized heading. Reply at 5:22–6:19; *see* Terms of Use at 1, 19.

Finally, Smith's argument that he had no reason to know that he would be bound by the Arbitration Agreement is unconvincing.  Opp. at 5:10–16.  Indeed, other courts have rejected this exact argument.  In *Taylor*, the consumer plaintiff argued that "he had no reason to believe that he was entering into a contractual agreement with Inflection" when he accessed a free background report that was previously provided to Airbnb.  *Taylor*, 2025 WL 3493898, at *1–2; *see id.* at *4 ("Mr. Taylor's only interaction with Inflection was to access a free copy of the consumer background report on him.").  The *Taylor* court explained that the plaintiff had reason to know that Inflection's contract terms existed because he had notice of the terms, and he assented to the terms.  *Id.* at *2.  Similarly, here, Smith had reason to know that he was bound by the Arbitration Agreement because he had notice of Inflection's Terms of Use—including the Arbitration Agreement contained within the Terms—and he agreed to the Terms by checking a box.  *See* Taylor Decl. ¶¶ 4–7, 10, Exs. 1–2.

Accordingly, Inflection has met its burden in showing that Smith had notice of the Arbitration Agreement.

### 2.  Enforceability

Smith argues that the Arbitration Agreement is (1) procedurally unconscionable because "Inflection's Terms of Use are a non-negotiable adhesion contract"; and (2) substantively unconscionable because it contains a class action waiver, overbroad arbitration clause, and "limitation of judicial relief and rights expressly provided by statute."  Opp. at 5:17–7:15.  Inflection responds that (1) Smith's arguments lack "any citation to supporting legal authority"; (2) the Arbitration Agreement is not procedurally unconscionable because a consumer can view their background report without agreeing to the Terms of Use; and (3) there "is nothing substantively unconscionable about requiring [Smith] to arbitrate his FCRA and CCRAA claims against Inflection."  Reply at 8:23–10:12.

"A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party."  *Ramirez v. Charter Comm'ns, Inc.*, 16 Cal. 5th 478, 492 (2024).  Under California law, a contract is unenforceable if it is both procedurally and substantively unconscionable.  *Armendariz*

16

United States District Court
Northern District of California

*v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).  Procedural unconscionability is "generally established by showing the agreement is a contract of adhesion, i.e., a standardized contract which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ramirez*, 16 Cal. 5th at 492 (cleaned up).  "Substantive unconscionability looks beyond the circumstances of contract formation and considers the fairness of an agreement's actual terms, focusing on whether the contract will create unfair or one-sided results." *Id.* at 493 (cleaned up).  Procedural and substantive unconscionability "need not be present in the same degree." *Armendariz*, 24 Cal. 4th at 114.  Instead, courts employ a sliding scale in which "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

A written arbitration agreement is unenforceable if it is unconscionable.  *Ramirez*, 16 Cal. 5th at 492.  "The party resisting enforcement of an arbitration agreement has the burden to establish unconscionability." *Id.*; *accord Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1158 (9th Cir. 2008).  The party seeking to establish an unconscionability defense must do so by a preponderance of the evidence.  *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1468 (2013).

Here, the Court finds that Smith fails to show that the Arbitration Agreement is unconscionable.  Smith argues that procedural unconscionability exists because "Inflection's Terms of Use are a non-negotiable adhesion contract," and a consumer cannot view a background report without agreeing to such Terms.  Opp. at 6:10–7:2.  To be sure, "[u]nconscionability analysis begins with an inquiry into whether the contract is one of adhesion." *Armendariz*, 24 Cal. 4th at 114.  But Smith does not dispute Inflection's evidence showing that consumers are not required to agree to Inflection's Terms of Use to view their background report because they can obtain the report by writing or calling Inflection instead of accessing the report on Inflection's website.  *See* Reply at 9:3–11 (citing Taylor Decl. ¶¶ 3–4) ("It is only the specific viewing of the report on Inflection's website for the consumer's own convenience that requires agreements to the Terms of Use.").  And Smith does not cite a single authority holding that an arbitration agreement

17

was procedurally unconscionable under the circumstances here. *See* Opp. at 6:10–7:2; Reply at 9:3–11. As such, because Smith fails to show that he was required to agree to the Terms of Use to view his background report, he fails to show that Inflection's Terms of Use constitute a contract of adhesion. *See Ramirez*, 16 Cal. 5th at 492 (explaining contract of adhesion requires party to adhere to contract or reject it). Therefore, the Court agrees with Inflection that because Smith fails to demonstrate that the Arbitration Agreement is procedurally unconscionable, the Court need not reach Smith's argument that the Agreement is substantively unconscionable. Reply at 9:12–19; *see Armendariz*, 24 Cal. 4th at 114 (explaining contract only unenforceable if it is both procedurally and substantively unconscionable).

Accordingly, Smith has not met his burden in showing that the Arbitration Agreement is unenforceable due to unconscionability.

### 3.    Scope

Smith argues that the Arbitration Agreement does not apply to his claims because "the cause of action does not relate to the use of Inflection's website, and instead, addresses statutory violations Inflection committed prior[.]" Opp. at 7:16–8:2. Inflection responds that that the Arbitration Agreement covers Smith's claims because Inflection "is in the business of providing background screening services," and Smith's "claims squarely relate to Inflection's 'background report.'" Reply at 6:22–8:22.

If a court finds that an agreement to arbitrate exists, the court must then determine whether the agreement encompasses the dispute at issue. *Brennan*, 796 F.3d at 1130. Generally, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted). If the arbitration agreement is broad and lacks "any express provision excluding a particular grievance from arbitration," then "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.* (citation omitted). Moreover, the party "resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531

18

U.S. 79, 91 (2000).

Here, the Court finds that the Arbitration Agreement encompasses Smith's claims against Inflection.  Inflection's Terms of Use define "services" as "all websites, mobile applications, information and screening services, and APIs."  Taylor Decl., Ex. 3.  The Arbitration Agreement extends to "any dispute, claim, or controversy ('Claim') between you and Inflection . . . arising out of or relating to the Terms, your electronic access to, purchase of, and/or use of any Inflection product or service[.]"  Reply at 7:1–10 (citing Terms of Use at 19).  In addition, all claims, "without limitation . . . must be resolved exclusively by final and binding arbitration, rather than in court[.]"  *Id.*  As such, Smith's claims against Inflection arise solely from his use of Inflection's services (its website) and products (its background report).  *See* Reply at 6:22–8:22; *Taylor*, 2025 WL 3493898, at *4 ("[W]hile the Terms do not seem explicitly to define 'products,' there can be no question that the consumer background reports that a consumer background report company generates are its products.").  In other words, but for the background report generated by Inflection about Smith, there would be no disputes relating to the accuracy of the report and, therefore, no claims against Inflection.  *Cf. Taylor*, 2025 WL 3493898, at *4 ("Mr. Taylor's claims, based on the alleged falsity of one of Inflection's products, therefore also relate to an Inflection product.").

Accordingly, Smith has not met his burden in showing that his claims fall outside the Arbitration Agreement's broad scope.

## C.    FAA Procedures

Inflection asks the Court to stay this case pending completion of arbitration.  Mot. at 15:15–19; Reply at 10:13–15.  "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see also Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 711 (9th Cir. 2024) ("Since *Spizzirri* made clear that a district court does not have discretion to dismiss the action when granting a motion to compel arbitration under 9 U.S.C. § 3, the court is compelled to grant Cathay Pacific's alternative request for a stay.").  Accordingly, the Court stays this case in light of its finding that Smith's claims are subject to the terms of the Arbitration Agreement.

19

United States District Court
Northern District of California

## V.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Inflection's Motion to Compel Arbitration and **STAYS** the proceedings in this Court pending resolution of the arbitration.  The parties are directed to provide the Court with joint status updates on the arbitration proceedings every 90 days from the date of this order.

**IT IS SO ORDERED.**

Dated: March 5, 2026

THOMAS S. HIXSON
United States Magistrate Judge